# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

DWAYNE GIVENS,

      Plaintiff,

v.

WILSON TRAILER COMPANY, DOUG
MASKELL, JOHN KREBER, and
R.J. STOWE

      Defendants.

No. 13-CV-4002-DEO

ORDER ON MOTION FOR SUMMARY
JUDGMENT

---

## I. INTRODUCTION

Currently before this Court is the Defendants' motion for summary judgment filed by Defendant Wilson Trailer Company, Defendant Doug Maskell, Defendant John Kreber and Defendant R.J. Stowe. Docket No. 15. Because the Defendants filed a single brief, the Court will refer to the Defendants, collectively, as Wilson Trailer, unless otherwise specified.

The parties appeared for a hearing on September 18, 2014. After hearing the parties' arguments, the Court took the issues under advisement and now enters the following.

## II.  FACTUAL HISTORY

In his Complaint, the Plaintiff, Mr. Givens, alleges that the Defendants committed employment discrimination.  Defendant Wilson Trailer Company is an Iowa corporation located in Sioux City, Iowa.  Wilson Trailer employed Mr. Givens as a welder from 2008, until they terminated his employment on January 28, 2011.  Wilson Trailer employs Defendant Maskell as a supervisor, Defendant Kreber as a human resources director, and Defendant Stowe as a supervisor.

The general allegation is that Mr. Givens experienced racial discrimination (he is African American, and the individual Defendants are Caucasian), and that the Defendants retaliated against him for reporting the alleged discrimination.  The Defendants contend that they fired Mr. Givens in accordance with the applicable employee handbook after he received his third written warning.

In support of the Defendants' allegation that Mr. Givens was fired in accordance with their policy, the following seems undisputed.  The Defendants had in place a handbook and other employment policies that stated employees could only be discharged for just cause.  In practice, this meant employees

2

could receive two written warnings in a 12 month period before being fired, and they would only be fired after the Defendants issued a third written warning within 12 months.  Wilson Trailer employees are represented by a trade union and that union oversaw implementation of the policy described above.

It is undisputed that Mr. Givens received three written warnings in the 12 month period leading to his discharge. However, Mr. Givens argues that the final two warnings were pretextual.  Mr. Givens admits that he received his first (relevant) written warning letter on February 26, 2010, for violating company policy on violence when he threatened another employee.  There is dispute between the parties regarding the nature or the legitimacy of first warning.

Mr. Givens received his second relevant written warning letter on September 28, 2010, for taking a fourth early-out within a six-month period, in contravention of Wilson Trailer's absence policy that allows three early-outs in a six-month period.  (Essentially, Mr. Givens left work early when he was not supposed to.)  It is undisputed that Mr. Givens received this warning and that the warning was neither overturned nor expunged.  However, Mr. Givens contends that he

had asked his supervisor, Mr. Ross, if he could leave early, and Mr. Ross gave permission. Defendants conceded that Mr. Givens did ask permission to leave early. Mr. Ross subsequently discovered that Mr. Givens was not eligible to leave early and issued the second warning letter. The Defendants admit that the facts giving rise to the second warning letter involved a mistake on the part of Mr. Ross because he should not have told Mr. Givens that he could leave early. However, the Defendants contend that Mr. Givens could have taken action to expunge the second warning letter, including turning the matter over to the union, but he never did. As will be discussed in more detail shortly, Mr. Givens alleges that the second warning was retaliatory because Mr. Ross had previously been disciplined for a racial incident reported to Wilson Trailer by Mr. Givens.

Mr. Givens received his third relevant written warning letter on January 24, 2011, for wasting company time by putting his food in a microwave oven prior to the beginning of his break time. Mr. Givens admits the essential facts of the third warning; he went to the 'tool crib' shortly before the lunch break was set to begin and began warming his lunch.

However, Mr. Givens contends that going to the 'tool crib' a little early was a routine practice among employees and that the only reason the Defendants issued him a warning for that incident is that he had recently filed a complaint about co-workers using racially derived profanity. Defendants contend that employees were routinely disciplined and warned about going to lunch early.

Following the third warning, Mr. Givens was given a three day suspension. When the warning was neither overturned nor challenge, the Defendants terminated Mr. Givens' employment.

Prior to his discharge, Mr. Givens had accused several employees of Wilson Trailer of committing racial discrimination and using racially insensitive language. The first incident occurred in 2008. Mr. Givens and another African American employee were working the night shift when they discovered a mock up of a noose hanging from a catwalk. It was eventually determined that Mr. Ross, mentioned above, tied the noose. (Mr. Ross claimed at the time and, seemingly, still claims, that the noose was tied for legitimate work purposes.) Wilson Trailer initially issued Mr. Ross a warning letter for leaving the noose hanging, but ultimately suspended

him for two days.  Mr. Givens filed a complaint arising out of the noose incident with the Iowa Civil Rights Commission on August 6, 2008, which was resolved by the Sioux City Human Rights Commission ("SCHRC").  The SCHRC found that there was no reason to doubt Mr. Ross' explanation that his tying the knot was not racially motivated.  Additionally, the SCHRC found that the "noose" did not constitute sever or pervasive harassment.  Mr. Givens did not appeal that conclusion or pursue a right to sue letter.

There were two incidents where other Wilson Trailer employees used 'the n word,' and the facts of those incidents are largely undisputed.  In the first, it was alleged that an employee, Mr. Peterson, referred to Mr. Givens by that term. Defendant Kreber called a meeting and discussed the situation with the parties.  In the second incident, another employee, Mr. Comstock, allegedly used the same word to refer to Mr. Givens.  Defendants found that Mr. Comstock did use that word and terminated his employment.  The incident with Mr. Comstock occurred only a few days before Wilson Trailer terminated Mr. Givens; and Mr. Givens alleges that his reporting of Mr. Comstock, and his insistence that Mr. Comstock be fired, upset

the Defendants and ultimately led to their decision to terminate him. Additionally, it seems undisputed that there were racially offensive things written in the bathroom(s) at Wilson Trailer. However, the specific facts about those writings are not contained in the record.

Others relevant facts will be discussed below.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56(c). A fact is *material* if it is necessary "to establish the existence of an element essential to [a] party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). There is a *genuine issue* as to a material fact if, based on the record before the court, a "rational trier of fact" could find for the non-moving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

When considering a motion for summary judgment, a "court must view the evidence in the light most favorable to the

nonmoving party . . . ." Hutson v. McDonnell Douglas Corp., 63 F.3d 771 (8th Cir. 1995). This requires a court to draw any reasonable inference from the underlying facts in favor of the nonmoving party and to refrain from weighing the evidence, making credibility determinations, or attempting to discern the truth of any factual issue in a manner which favors the moving party unless there is no reasonable alternative. See Matsushita, 475 U.S. at 587; and Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008) (citing Thomas v. Corwin, 483 F.3d 516, 526-27 (8th Cir. 2007)).

Procedurally, the movant bears the initial burden "of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citing Celotex, 477 U.S. at 323). Once the movant has carried his burden, the non-moving party is required "to go beyond the pleadings" and through "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(e)).

In times past, courts suggested that the standard for summary judgment in employment discrimination cases required a higher showing than in 'other' summary judgment cases. However, the 8th Circuit rejected that view, stating:

> summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed. There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011). However, that is not to say that discrimination cases do not present their own unique challenges. As Judge Bennett of this Court recently observed:

> experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, are difficult to prove. They are perhaps more difficult to prove today-fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA-than during the earlier evolution of these anti-discrimination and anti-retaliation

statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. See, e.g., <u>Riordan v. Kempiners</u>, 831 F.2d 690, 697-98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." <u>Rogers v. EEOC</u>, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII). My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. See, e.g., <u>id.</u> Rather, discrimination and retaliation

plaintiffs tend to be those average or below-average workers-equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA-for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. See, e.g., id. On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part. This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

Pick v. City of Remsen, 2014 WL 4258738, 11-12 (N.D. Iowa 2014).

## IV. ISSUES

Defendants' Motion for Summary Judgment raises several issues. First, the Defendants argue that Mr. Givens' state law claims are time barred. Second, Defendants argue that individual supervisors cannot be held liable under Title VII. Finally, Defendants argue that Mr. Givens has failed to set out racial discrimination/hostile work environment/ retaliation claims under the applicable standard. The Court will address these issues below.

## V.  ANALYSIS

### A.  State Law Claims

Mr. Givens' first set of claims arise under the Iowa Civil Rights Act (ICRA).  A person claiming to be aggrieved by an unfair or discriminatory employment practice under the Iowa Civil Rights Act must first seek administrative relief by filing a complaint with the Iowa Civil Rights Commission, which Mr. Givens did.  However, Defendants argue those claims are time barred.

Iowa Code § 216.16(2) provides in pertinent part:

> [u]pon a request by the complainant, and after the expiration of one hundred twenty days from the timely filing of a complaint with the commission, the commission shall issue to the complainant a release stating that the complainant has a right to commence an action in the district court....

I.C.A. § 216.16(2).  Section 216.16(3) provides in pertinent part:

> [a[n action authorized under this section is barred unless commenced within ninety days after issuance by the commission of a release under subsection 2 of this section.

I.C.A. § 216.16(3).  The term issuance is vague and has been discussed by the Courts before:

[i]n <u>Saemisch v. Ley Motor Co.</u>, 387 N.W.2d 357 (Iowa 1986), the Iowa Supreme Court considered the meaning of the words 'issue to the complainant' and 'after issuance by the commission' of a release-to-sue letter under the Iowa Civil Rights Act. Iowa Code § 216.16(2) and (3). The plaintiff in <u>Saemisch</u> commenced his action under the Iowa Civil Rights Act within ninety days from the date he received his right-to-sue letter, but ninety-four days from the date the commission mailed the letter. <u>Id.</u> at 358. The Iowa Supreme Court held that the plaintiff's ninety days began to run on the date the letter was mailed to the plaintiff by certified mail. <u>Id.</u> at 359. In arriving at this conclusion, the court considered the dictionary definition of 'issue,' which is "'to cause to appear or become available by officially putting forth or distributing or granting or proclaiming or promulgating.'" <u>Id.</u> at 358 (quoting Webster's Third New International Dictionary 1201 (1969)).

<u>Westin v. Mercy Med. Servs., Inc.</u>, 994 F. Supp. 1050, 1058 (N.D. Iowa 1998). As stated in the Defendants' brief:

[t]he undisputed evidence shows that the ICRC issued its right-to-sue letter on October 3, 2012. The right-to-sue letter itself expressly states as much: "With this Administrative Release, the Complainant has the right to commence an action in state district court. That action must be commenced within ninety (90) days of the issue date 10/3/2012." See ICRC Right-to-Sue Letter, Bates No. 00113 (emphasis in original), Defendants' App'x at 130. And the Plaintiff conceded, in his complaint, that the right-to-sue letter

> from the ICRC was issued on October 3,
> 2012. See Complaint, ¶ 11, Defendants'
> App'x at 124. Thus, any action on Givens's
> ICRA claims would be forever barred unless
> filed within ninety days of that date:
> January 2, 2013... (The ninetieth day
> after October 3, 2012[,] was January 1,
> 2013. Because the limitations period
> expired on New Year's Day, under Iowa Code
> § 4.1(34) the time was extended to include
> the next full day: January 2, 2013.)

Docket No. 15, Att. 3, p. 9.

Mr. Givens did not address this issue in his brief. During the hearing, Mr. Givens' attorney admitted that the filing was (a day) late. Mr. Givens' attorney merely stated that he was unfamiliar with filing documents in the Northern District of Iowa and hoped the Court would excuse his neglect.

It is true that in some cases, the doctrine of equitable tolling may apply to excuse a late filing. However, the concept of equitable tolling is "appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands." Heideman v. PFL, Inc., 904 F.2d 1262, 1266 (8th Cir. 1990). In this case, Mr. Givens has made no allegation that late filing was caused by some matter outside

his control.[1]  Accordingly, equitable tolling does not apply and Mr. Givens' claims arising under ICRA must be denied.

**B.  Individual Supervisors**

As set out in the Defendants' brief:

> Givens's complaint does not clearly state whether he is alleging claims for violations of Title VII of the Civil Rights Act of 1964 against the individual defendants herein:  Maskell, Kreber, and Stowe.  Cf. Complaint ¶ 43 ("Defendants retaliated against Givens as set forth above in violation of 42 U.S.C. § 2000e, et seq. and Iowa Code Chapter 216." (emphasis added)) . But if Givens[] is making such claims, those claims fail as a matter of law.  As this Court has recognized, the United States Court of Appeals for the Eighth Circuit has repeatedly held that supervisory employees cannot be held individually liable under Title VII. <u>Habben v. City of Fort Dodge</u>, 472 F. Supp. 2d 1142, 1155 (N.D. Iowa 2007)... As such, any Title VII claims that Givens is alleging against Maskell, Kreber, and Stowe fail as a matter of law, and the Defendants are entitled to summary judgment on those claims.

---

[1]  The Court notes that Plaintiff's attorney sent the Clerk of Court's office an email on the night of January 2, 2014, about filing the present case.  However, the Court found no authority that stated that attempting to the contact the Clerk of Court's office, after hours, after a deadline had passed, would affect the equitable tolling/statute of limitations analysis.

Docket No. 15, Att. 3, p. 10-11.  Again, Mr. Givens does not address this issue in his brief.

The law, as set out by the Defendants, is correct. Accordingly, to the extent Mr. Givens attempted to sue his individual supervisors in their individual capacity under Title VII, those claims must be denied.

## C.  Title VII Claims

Mr. Givens alleges three causes of action under Title VII:  racial discrimination, hostile work environment, and retaliation.  The Defendants argue those claims fail as a matter of law.  The Court will consider each allegation.

### 1.  Racial Discrimination

Under the Civil Rights Act of 1964 (hereinafter "Title VII"), it is unlawful for an employer to discriminate against an employee based on race, color, religion, sex, or national origin, and "Iowa Courts ... turn to federal law for guidance in evaluating ICRA."  42 U.S.C. § 2000e-2.  Title VII also prohibits retaliation against employees for opposing practices made unlawful by the act.  Young-Losee v. Graphic Packaging Intern., Inc., 631 F.3d 909, 911–12 (8th Cir. 2011).

A party may prove a discrimination or retaliation claim through either direct or indirect evidence. <u>Guimaraes v. SuperValu, Inc.</u>, 674 F.3d 962, 972 (8th Cir. 2012). Direct evidence "is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision,'" which, in this case, was Plaintiff's termination. <u>Id.</u> (quoting <u>Thomas v. First Nat'l Bank of Wynne</u>, 111 F.3d 64, 66 (8th Cir. 1997)). If there is direct evidence linking a defendant's alleged discrimination with an adverse employment decision, or there is direct evidence linking an adverse employment decision with a retaliatory motive, summary judgment is generally inappropriate. <u>Id.</u>

Mr. Givens presents no direct evidence of intentional race discrimination, but, rather, bases his claims on circumstantial evidence. Accordingly, the Court applies the analytical framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) to analyze Mr. Givens' race discrimination claims.[2] See also <u>Gordon v. Shafer Contracting Co., Inc.</u>, 469 F.3d 1191, 1196 (8th Cir. 2006) (providing that

---

[2] Mr. Givens seemingly concedes there is no direct evidence of racial discrimination by using the <u>McDonnell Douglas</u> framework in his brief.

the McDonnell Douglas burden-shifting framework governs claims of race discrimination under 42 U.S.C. § 1981). Under the McDonnell Douglas burden-shifting analysis, a plaintiff must first establish a prima facie case of discrimination. Id. If the plaintiff does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the allegedly discriminatory action. Id. If the employer provides such a reason, then the burden shifts back to the plaintiff to present evidence that the employer's reason was a pretext for the discriminatory action. Id.

In order to establish a prima facie case of race discrimination, Mr. Givens must show that: (1) he is a member of a protected class; (2) he was meeting the legitimate job expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated differently. Chappell v. Bilco Co., 675 F.3d 1110, 1118 (8th Cir. 2012). With regard to the fourth element, in order to be similarly situated, "'the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any

mitigating or distinguishing circumstances.'" <u>Barber v. C1</u>
<u>Truck Driver Training, LLC</u>, 656 F.3d 782, 796 (8th Cir. 2011)
(quoting <u>Wierman v. Casey's General Stores</u>, 638 F.3d 984, 994
(8th Cir. 2011)).

The parties agree to the first and third elements of the
racial discrimination claim. Mr. Givens is an African
American; and he did suffer an adverse action, he was
terminated. However, the parties dispute whether or not he
was fulfilling his job duties and whether similarly situated
employees were treated differently. In his brief, Mr. Givens
argues that he was given pay raises and received positive
evaluations through out his time at Wilson Trailer.
Accordingly, he argues that he has also proven the second
element of the prima facie case, that he was meeting Wilson
Trailer's legitimate job expectations. As will be discussed
in greater detail below, there are serious questions regarding
the second and third warning letter which ultimately led to
Wilson trailer terminating Mr. Givens' employment. What is
clear on the record is that none of the warnings get to the
actual issue of Mr. Givens' job performance. Accordingly,
because Mr. Givens received positive evaluations and received

pay raises, and because his discharge was not related to his actual job performance, the Court is persuaded that there is at least a genuine issue as to whether Mr. Givens has sufficiently plead the second element. Accordingly, the Court will concentrate its analysis on whether Mr. Givens has sufficiently demonstrated the fourth element, whether similar employees of a different race were treated differently.

To prove the fourth element, Mr. Givens relies on pretext. Evidence of pretext, normally considered at step three of the McDonnell Douglas analysis, can satisfy the inference-of-discrimination element of the prima facie case. See Putman v. Unity Health Sys., 348 F.3d 732, 736 (8th Cir. 2003). A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision. Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010).

Based on that, Plaintiff argues:

> Besides Givens and J.B. Garth, only two other employees of Wilson have ever complained of harassment and/or discrimination based upon race, during

Kreber's time working at Wilson. Those two
employees are Damien Keams and Lance
Flaugh. Of these four employees, three are
African-American (Givens, Garth, and Keams)
and one is Caucasian (Flaugh). After
making complaints about harassment and/or
discrimination based upon race, Givens and
Keams were subsequently terminated for
violating the attendance policy, Garth was
demoted from his supervisor position and
Flaugh (the Caucasian) continues to work at
Wilson in the same position. (Kreber's
Dep. At 133:11-138:11, App. 43-48) Wilson
Trailer's policies provide for permissive
language on the discipline and termination
of employees. The testimony in this case
indicated that the second and third
warnings and the ultimate termination
itself were not "automatic" and if
different discretion had been applied by
the decision-maker a different result would
have been reached. (Maskell Dep. At
69:21-71 :3, App. 22-24); (Kreber Dep. At
102:8-103:14, App. 40-41) To show that the
discretion that was applied was tainted by
discriminatory animus, the court need look
no further than the following:

Jason Ross - Givens' supervisor and the
person who received a two-day suspension
resulting from Givens' complaint that Ross
made a "noose" was the person who
"accidentally" provided Givens the wrong
information on the number of "early outs"
that Givens had; Givens relied on this
incorrect information provided by Ross and
took an early out in excess of Wilson
Trailer policies; even though Ross knew he
- himself - was the reason that Givens
exceeded the allowed number of "early
outs," Ross exercised his judgment in
giving Givens a written warning regardless.

21

R.J. Stowe - Stowe was also the supervisor of Bobby Comstock; within weeks of Comstock's termination resulting from Plaintiffs complaint of being called a "nigger" and Stowe's desire to retain Comstock instead of terminating him - Stowe exercises his discretion in doing a written warning for Plaintiff for being out of his work area and at lunch early- even though other white employees were as well and this rule was not consistently applied.

A reasonable jury could find that Ross' behavior in placing a "noose" in the workplace - despite being a supervisor and because he was punished with a 2 day suspension without pay - is evidence that Ross' discretion in punishing Plaintiff for taking an extra "early out" was discriminatory based upon race.  This is further underscored by the fact that Ross was the person who told Plaintiff that he had not exceeded his "early outs" and that Plaintiff relied upon Ross' representation in this regard in taking the early out.  A reasonable jury could also find that Stowe's support of retaining Comstock - an employee who called Givens a "nigger" - and lack of punishment for white employees who were also out of their work stations or at lunch early as Plaintiff was is evidence that Stowe's discretion in punishing Plaintiff for being out of his work station and allegedly beginning lunch early was discriminatory based upon race.  Indeed, there was a white employee was [sic] already eating his lunch while Plaintiff

> was still warming up his food and the white
> employee did not receive a write up.

Docket No. 21, p. 9-10.

Based on that argument, the Court is persuaded that Mr. Givens has created a fact issue on whether similarly situated members of the protected class were treated differently from those not in the protected class. It is undisputed that those African Americans who complained of discrimination experienced the adverse actions described by the Plaintiff. The Defendants argued there was a legitimate reason for each action. However, that is a factual question that should not be decided at this early stage of the case.

As discussed above, under <u>McDonnell Douglas</u>, after the Plaintiff has alleged a prima facie case, the burden falls to the Defendants to allege a legitimate reason for the adverse action. In this case, the Defendants argue:

> Wilson Trailer has proffered legitimate, nondiscriminatory reasons for disciplining and terminating Givens... Wilson Trailer issued each of the three relevant written warning letters because Givens violated a company policy, and Wilson Trailer terminated Givens in conformity with its policy of terminating employees who receive three written warning letters in a one-year period, absent extenuating circumstances. This is sufficient to carry Wilson

> Trailer's "minimal burden" of proffering a
> legitimate, nondiscriminatory reason for
> its actions.  See <u>Fiero v. CSG Sys., Inc.</u>,
> 759 F.3d 874, 877 (8th Cir. 2014).

Docket No. 15, Att. 3, p. 33.  The Defendants are correct that
they have alleged a legitimate reason for discharge.  There is
no dispute that Mr. Givens received three warnings letters and
that Wilson Trailer discharged him in conformity with their
handbook.   Accordingly,  the  burden  shifts  back  to  the
Plaintiff to allege pretext.

    In the portion of the Plaintiff's brief quoted above, the
Plaintiff discusses the alleged pretext at issue in this case.
Specifically, the Plaintiff alleges that the last two warnings
were pretextual.   The Court agrees that the Plaintiff has
alleged pretext in regards to the last two letters.  Jason
Ross wrote the second warning letter.  The letter was based on
the fact that Mr. Givens left work early.  However, Mr. Ross
had given Mr. Given permission to leave early.  Moreover, Mr.
Ross was involved in the noose incident and was disciplined
for the same.  Clearly, the fact that Mr. Ross was disciplined
for a racially insensitive incident, then gave Mr. Givens
permission to leave early, and then wrote Mr. Givens up for
leaving early casts serious doubt over that warning letter.

At the very least, Mr. Givens has created a fact question regarding pretext. Similarly, Mr. Givens has alleged that numerous people went to lunch a little early at Wilson Trailer. He alleges he was singled out because he recently complained about offensive language. This is a sufficient pretextual allegation for Mr. Givens to survive summary judgment on the racial discrimination claim.

## 2. Retaliation

Section 1981 retaliation claims are analyzed under the same framework as Title VII claims. Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1146 (8th Cir. 2012). In order to establish a prima facie case of retaliation when there is no direct evidence, Mr. Givens must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two events. Id. If the plaintiff establishes a prima facie case of retaliation, the defendant must provide a legitimate, non-discriminatory reason for its decision. Davis v. Jefferson Hosp. Ass'n, 685 F.3d 675, 684 (8th Cir. 2012). If the defendant provides a legitimate, non-discriminatory reason, then the plaintiff has

the burden of showing that the proffered reason was merely a pretext for discrimination, and has the burden of creating a reasonable inference that the defendant acted in retaliation for the plaintiff's protected conduct.  <u>Smith v. Riceland Foods, Inc.</u>, 151 F.3d 813, 818 (8th Cir. 1998).

In this case, the parties agree on the first two elements of retaliation.  Mr. Givens engaged in protected activity, he complained of the racial issues.  He was then fired.  The first real question is whether there is a causal connection between the two events.

It is well known that a close temporal connection can be used to demonstrate a causal relationship between protected activity and an adverse action.  In this case, Mr. Givens' protected activity occurred a few weeks before his termination.  Considering that close temporal connection, along with the allegedly pretextual nature of the second warning letter (discussed above), the Court is persuaded that Mr. Givens has alleged a casual connection between the protected activity and the adverse action, and thus, has stated a prima facie case for retaliation.

Once Mr. Givens has established a prima facie case, the burden shifts under <u>McDonnell Douglas</u> to the Defendant to show a legitimate reason for discharge.  This analysis is identical to the analysis conducted in the previous section regarding racial discrimination.  Accordingly, the Court, again, finds that Defendants can show a non-retaliatory reason for firing, but the Plaintiff has sufficiently alleged that the proffered reason is pretextual.  Accordingly, Mr. Givens' retaliation claim must survive summary judgment.

### 3.  Hostile Work Environment

As previously noted, Plaintiff also makes a hostile work environment claim under Title VII.  "Hostile work environment harassment occurs when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  <u>Singletary v. Missouri Department of Corrections</u>, 423 F.3d 886, 892 (8th Cir. 2005) (quoting <u>Tademe v. Saint Cloud State University</u>, 328 F.3d 982, 991 (8th Cir. 2003)).  "The environment must be both objectively hostile as perceived by a reasonable person and subjectively abusive as

actually viewed by [the plaintiff]." Anderson v. Durham D &
M, L.L.C., 606 F.3d 513, 518 (8th Cir. 2010) (citing Bowen v.
Missouri Department of Social Services, 311 F.3d 878, 883 (8th
Cir. 2002)). In considering the objective component, courts
examine the totality of the circumstances, "including the
frequency of the discriminatory conduct, its severity, whether
it is physically threatening or humiliating or a mere
offensive utterance, and whether the conduct unreasonably
interfered with the employee's work performance."
Singletary, 423 F.3d at 893 (citing Bainbridge v. Loffredo
Gardens, Inc., 378 F.3d 756, 759 (8th Cir. 2004)).
Additionally, if a plaintiff attempts to establish a hostile
work environment based on the actions of co-workers, he must
also show that "the employer knew or should have known of the
harassment and failed to take prompt and effective remedial
action." Jenkins v. Winter, 540 F.3d 742, 748 (8th Cir. 2008)
(citation omitted). Finally, in Anderson, the Eighth Circuit
Court of Appeals explained the demanding nature of the
standards required to be met in a hostile work environment
claim:

> Hostile work environment claims must meet 'demanding' standards and courts are to 'filter out' those complaints concerning the 'ordinary tribulations of the workplace.' 'Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' 'Mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate § 1981.'

606 F.3d at 519 (quotations omitted).

In Gipson v. KAS Snacktime Co., the Eighth Circuit indicated that "the same standards are generally used to evaluate claims of hostile work environment based upon sexual ... and racial harassment." 171 F.3d 574, 578 (8th Cir. 1999). In order to establish a hostile work environment claim, a plaintiff must prove the following: "(1) [he] belonged to a protected group; (2) [he] was subjected to unwelcome harassment; (3) the harassment was based on" his status as a protected class member; "and (4) the harassment affected a term, condition, or privilege of [his] employment." Ogden v. Wax Works, Inc., 214 F.3d 999, 1006 (8th Cir. 2000). 2013). Where the harassment was at the hands of a coworker, and not a supervisor, Givens' hostile work environment claim

includes a fifth element requiring him to show that the employer knew or should have known of the harassment, but failed to take proper remedial action. Jacob-Mua v. Veneman, 289 F.3d 517, 522 (8th Cir. 2002)(abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1059 (8th Cir. 2011)).

The Defendant concedes that Mr. Givens is a member of a protected group and that he suffered harassment based on the protected characteristic. However, the Defendants argue Mr. Givens cannot allege that harassment affected a term or condition of his employment.

The first incident that needs to be discussed is the noose incident. Defendants argue that the potential harassment involved in the noose incident has already been considered and is barred by the principal of res judicata. As set out in the Defendants' brief, "state administrative decisions are given preclusive effect with respect to issues later raised in a federal-court lawsuit '[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.'"

<u>Herrera v. Churchill McGee, LLC</u>, 680 F.3d 539, 547 (6th Cir. 2012) (quoting <u>Univ. of Tenn. v. Elliott</u>, 478 U.S. 788, 797-98 (1986)). "In such circumstances, 'federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts.'" <u>Id.</u> Under Iowa law, a determination by a city civil rights commission has preclusive effect, and so bars a claimant from filing suit in district court, where the requirements of res judicata are satisfied. <u>Bennett and Cf. Mason City Human Rights Commission v. MC No. 619, Inc.</u>, 586 N.W.2d 512, 517-18 (Iowa 1998) see also <u>City of Des Moines Police Dep't v. Iowa Civil Rights Comm'n</u>, 343 N.W.2d 836, 839 (Iowa 1984) ("[A] final adjudicatory decision of an administrative agency such as the [Iowa Civil Rights] Commission is entitled to res judicata effect as if it were a judgment of a court."). The Plaintiff did not address this issue in his brief, and the Court has found no reason to dispute the Defendants' statement of the law on this issue. The principle of res judicata includes the doctrines of issue preclusion and claim preclusion. "Issue preclusion prevents parties from relitigating in a subsequent action issues raised and resolved in a previous action." <u>EMC</u>

<u>v. Van Haaften</u>, 815 N.W.2d 17, 22 (Iowa 2012) (internal citation and quotation omitted).  Issue preclusion applies where four elements are established:

> (1) the issue in the present case must be identical, (2) the issue must have been raised and litigated in the prior action, (3) the issue must have been material and relevant to the disposition of the prior case, and (4) the determination of the issue in the prior action must have been essential to the resulting judgment.

<u>Id.</u>

In his Response to the Defendants' Statement of Undisputed Facts, the Plaintiff admitted the following:

> [t]he SCHRC reviewed the evidence submitted by the parties regarding the charge, and interviewed witnesses.  SCHRC Opinion, Bates Nos. 243-47, Defendants' App'x at 115-19.  The SCHRC found that there was no reason to doubt Ross's explanation that his tying the knot was not racially motivated. SCHRC Opinion, Bates No. 246, Defendants' App'x at 118.  The SCHRC found that the "noose" did not constitute sever or pervasive harassment. SCHRC Opinion, Bates No. 246, Defendants' App'x at 118.  The SCHRC decided that there was no probable cause on any of the issues that Givens raised in his complaint with respect to the "noose."  SCHRC File, Bates No. 247, Defendants' App'x at 119.  The ICRC notified Givens that the Sioux City Human Rights Commission had made a determination and closed its case on Givens's charge. ICRC Letter (8/27/2010), Bates No. 242,

> Defendants' App'x at 114. The ICRC notice
> informed Givens that he could request that
> the ICRC reconsider its decision and
> re-open the case, or he could request a
> right-to-sue letter, ICRC Letter
> (8/27/2010), Bates No. 242, Defendants'
> App'x at 114. Givens never requested
> reconsideration, or a right-to-sue letter,
> following the SCHRC's decision.

Docket No. 21, Att. 1, p. 8.

Based on those admitted to and agreed upon facts, the Court is persuaded that the noose issue was raised in the previous administrative action, was the identical issue here, was material to that case, and the administrative agency's analysis of the noose incident was essential to their judgment. Accordingly, the issue of whether the noose incident was racially motivated harassment has already been considered by the agency and the agency determined that the noose was not intended to harass Mr. Givens or anyone else. Accordingly, the existence of the alleged noose cannot be used to determine whether there was a hostile work environment at Wilson Trailer.[3]

---

[3] In the previous section(s), the Court considered the noose incident in finding pretext. However, in those sections, the Court was considering the facts that 1) Mr. Givens reported the noose incident and 2) that Mr. Ross was disciplined for the noose incident. Those two issues exist

The other racial incidents were carried out by co-workers, not supervisors, and Mr. Givens has failed to allege a prima facie case for each incident. It is alleged that co-workers wrote insults on Mr. Givens' lunch box and, possibly, the bathroom stalls. However, there is no indication that those insults had a racial animus or were tied to Mr. Givens' status as a member of a protected group. There are also the incidents, described above, where co-workers Mr. Peterson and Mr. Comstock used racially offensive language. However in each of those situations, the supervisors took remedial action. Supervisors talked to Mr. Peterson, and his use of the offensive language stopped. Wilson Trailer fired Mr. Comstock for using the offensive language. Additionally, Mr. Givens has failed to allege how any of the alleged harassment affected a term, condition, or privilege of his employment. Accordingly, Mr. Givens cannot establish a hostile work environment prima facie case. The Defendants' Motion for Summary Judgment on this claim must be granted.

---

separate from the question of whether the noose incident was in fact harassment, which is the issue in this section.

**D.   Front Pay**

The final issue discussed by the parties is whether the Plaintiff is entitled to an award of front pay.  Defendants argue that the Plaintiff cannot offer competent evidence on the issue of front pay without an expert witness.  Plaintiff contends that this is a question left up to the judge and should be based on the four factor test set out in <u>E.E.O.C. v. HBE Corp.</u>, 135 F.3d 543, 555 (8th Cir. 1998).

The Court is persuaded that this issue is best left for trial.   The Plaintiff may testify, if possible, to the relevant factors and then the Court will make the appropriate findings.   Following the close of evidence, the Court can determine whether there is sufficient evidence to consider the issue of front pay.  Accordingly, the Defendants' Motion for Summary Judgment is denied on this issue.   However, the Defendants will be free to raise this issue again at the time of trial.

**VI.   CONCLUSION**

For the reasons set out above, the Defendants' Motion for Summary Judgement, Docket No. 15, is granted in part denied in part.  The motion is granted regarding Mr. Givens' state law

claims, his Title VII claims against individual supervisors and his hostile work environment claim. However, the Motion for Summary Judgment regarding racial discrimination, retaliation, and front pay is denied as set out above.

**IT IS SO ORDERED** this 30th day of September, 2014.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa